IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-00467-PAB-KMT

BWP MEDIA USA INC., d/b/a Pacific Coast News, and
NATIONAL PHOTO GROUP, LLC,

      Plaintiffs,

v.

CLARITY DIGITAL GROUP, LLC,

      Defendant.
_____

**ORDER**
_____

This matter is before the Court on the Motion for Summary Judgment [Docket No. 19] filed by defendant Clarity Digital Group, LLC.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND[1]

Defendant owns and operates www.examiner.com ("Examiner.com" or the "site"), a website where were visitors can access articles on a variety of topics including arts, entertainment, news, sports, and technology.  Docket No. 19 at 2.

Plaintiffs are the owners of photographs, which they license for use by online and print publications.  Docket No. 63 at 4, ¶ 18; *see also* Docket No. 1-2.  Plaintiffs accuse defendant of copying, posting, and/or displaying 75 of their photographs ("plaintiffs' photographs") on Examiner.com without permission or authorization.  Docket

_____

[1]The following facts are undisputed unless otherwise indicated.

No. 1 at 3, ¶ 16.  Content on the site is produced by contributing authors, referred to as "Examiners."  Docket No. 19 at 2, ¶¶ 1-2.

Defendant recruits individuals to contribute to its site.  Docket No. 21 at 2, ¶ 4. Examiner.com states that contributors will enjoy benefits such as increased exposure for their work product, compensation tied to writing activity and reader interest, "Examiner Support . . . available 24/7 to help you improve your writing, technical and marketing skills, and a team of staff "based in Denver, CO who are available to offer feedback, answer your questions and welcome you to our community of independent contributors."  Docket No. 64-4 at 2.

In order to become an Examiner, interested persons must submit an application and writing sample.  Docket No. 63 at 4, ¶ 22.  As part of their application, applicants indicate the topic on which they wish to write.  Defendant reviews applications from potential Examiners to confirm that the applicant has some ability to write, is somewhat knowledgeable regarding the topic they have chosen, and appears to be reasonably qualified to create the type of content that defendant wishes to feature on the Examiner. Docket No. 19 at 2, ¶ 2.  Defendant also conducts regular background checks on applicants.  Docket No. 64-4 at 2.  False information provided by an Examiner as part of his or her application "is grounds for immediate dismissal."  *Id.*

Once defendant accepts an applicant, defendant sends the Examiner an email confirming the topic on which that Examiner will provide content.  Docket No. 63 at 5, ¶ 21.  The Examiner must also enter into the "Examiners Independent Contractor Agreement and License" (the "Examiner agreement") before receiving permission to post to the site.  Docket No. 19 at 2, ¶ 3.  By signing the Examiner agreement, the

Examiner agrees to use his or her "best efforts" to create works on a topic for a specific Examiner.com edition, maintain his or her topic page, publish works to the topic page using the Examiner.com publishing application, create an online community related to his or her topic page, and drive legitimate traffic to the topic page.  Docket No. 21-2 at 2.  The Examiner agreement states that Examiners will "regularly create and post new Works to the Web Page and update the Web Page as often as reasonably needed."  Docket No. 21-2 at 2, ¶ 1.  The Examiner agreement obligates the examiner to "coordinate with a representative designated by Examiner.com . . . in the provision of the Services.  You will alert the Representative regarding any important or interesting Works to be featured on the Web Page."  Docket No. 21-2 at 2, ¶ 1.

The Examiner agreement states that Examiners "must have permission from the owner/copyright holder of any content before including it on your Web Page, unless it was provided by Examiner.com."  Docket No. 12-2 at 3, ¶ 4.a.

The Examiner agreement also requires Examiners to comply with the Examiner.com Editorial Requirements (the "Editorial Requirements").  Docket No. 19 at 2, ¶ 3.  The Editorial Requirements direct Examiners to follow the "AP Style" guidelines and to keep their articles free of profanity, focused on the Examiner's assigned topic "unless otherwise approved by Examiner.com," and composed of original content. Docket No. 21-3 at 2.  Objectionable photos, audio, or video are prohibited unless approved by Examiner.com before publication.  *Id.* at 2-3.  Examiners are required to submit accurate articles, "[e]nsure that all articles posted on the site are clearly relevant to your topic," and, if a "Local Examiner," "are expected to either write about stories that are specific to their market[] or to effectively localize a National story."  *Id.* at 4-5.

3

Submitted articles "should be about 200 to 400 works on average, with a minimum of 150 words." *Id.* at 5. "Any approvals by Examiner.com described in these Content Requirements should be sent to your Channel designate." *Id.* at 4. The Editorial Requirements prohibit Examiners from posting content that the Examiner does not have a right to make publicly available and state:

> Do not include any copyrighted material on our site (including text, photos, video, audio, or anything else) without the permission of the owner, and be sure to provide attribution to the source where applicable . . . . You also may not post any content that infringes any patent, trademark, trade secret, copyright or other proprietary rights of any party. Repeat infringers will be terminated as Examiners in appropriate circumstances.

*Id.* at 3-4.

An Examiner is eligible to be compensated for his or her posts pursuant to the Examiner.com Payment Policy. Docket No. 64-5 at 2. In order to be eligible for compensation, an Examiner must post a new article at least once a month. *Id.* The amount of compensation an Examiner receives is determined by a number of factors, including revenue, subscriptions, sponsorship, page view traffic, and session length. *Id.* Examiner.com does not guarantee that Examiners will be compensated for their work. *Id.*; *see also* Docket No. 64-7. The Examiners who used plaintiffs' photographs in their articles earned $415,907.56 from defendant between June 2012 and February 2014, although it is not entirely clear whether this amount reflects those Examiners' total compensation for that time period or reflects only compensation related to articles containing plaintiffs' photographs. Docket No. 63 at 5, ¶ 27; *see also* Docket No. 64-6.

Defendant asserts that it did not derive any revenue directly attributable to the plaintiffs' photographs. Docket No. 19 at 4, ¶ 9. Plaintiffs dispute this assertion, citing

to the declaration of defendant's Vice President of Content Operations Lucy Suzanne

Austin, which states, in relevant part, that defendant

> derives revenue from display advertising placed by third parties on the Examiner.com website. While those revenues are determined, in part, by the volume of visitors to Examiner.com, no advertising revenues are associated with or dependent upon any particular webpage posted by an Examiner, much less with any particular photograph posted by any examiner.

Docket No. 21 at 4, ¶ 14.

Once an Examiner has been approved and has agreed to defendants' terms, the

Examiner is given authorization to use defendant's publishing tool to contribute content

directly to Examiner.com on the Examiner's assigned topic.  Docket No. 21 at 2, ¶ 6.

The Examiner posts content on an assigned topic directly to his or her topic page,

which bears the Examiner's name and assigned topic title.  Docket No. 21 at 2, ¶¶ 6-7.

The Examiner may modify or remove an article from his or her topic page at any time,

*id.*; however, once an article is posted on the topic page, defendant exclusively

determines whether an article will be featured elsewhere on the site, such as the

Examiner.com main page or, for example, the site's "Arts & Entertainment" page.

Docket No. 63 at 5, ¶ 30.

Plaintiff disputes this, arguing that, although Ms. Austin states that defendant

does not review all material posted to the site, Ms. Austin does not state that defendant

reviews none of the material posted by Examiners.  Docket No. 63 at 4, ¶ 15 (citing

Docket No. 21 at 3, ¶ 9).

Defendant asserts, within each Examiner's assigned topic, each Examiner alone

determines the content what he or she posts to the topic site.  Docket No. 19 at 3, ¶ 5.

Plaintiffs dispute this assertion, citing to periodic emails from Examiner.com to

5

Examiners suggesting content that Examiner.com intends to cover and/or place "at the top believe of the website," encouraging Examiners to "please participate and let us help you increase your exposure to gain a bigger audience." *See, e.g.*, Docket No. 64-10 at 7.  Defendant asserts it did not review, discuss, or approve the use of plaintiffs' photographs before they were posted to Examiner.com.  Docket No. 19 at 5, ¶ 15. Defendant asserts it does not pre-screen, edit, or approve articles before an Examiner posts them to his or her topic site.  Docket No. 19 at 6, ¶ 6.  Examiners post approximately 1,600 articles per day and defendant "does not review all of the material posted . . . ; nor does [defendant] have the staff available to do so."  Docket No. 21 at 3, ¶ 9.  Plaintiffs dispute these assertions by citing to a screen capture from the Examiner.com blog that states, in relevant part, "We have Content Managers and a Review Team who provide in depth training and resources center, Examiner University, to provide assistance and coaching.  These teams are constantly providing editorial guidance and monitoring content to ensure there is the highest quality of accurate information available on the site."  Docket No. 64-3 at 2.  Ms. Austin states that defendant was previously unaware of these statements contained on the Examiner.com blog and that such statements were promptly removed from the site.  Docket No. 65-1 at 1-2, ¶¶ 2, 4.  Ms. Austin states that, to her knowledge, defendant has never provided "extensive training" or "constantly provid[ed] editorial guidance and monitor[ed] content" posted to the Examiner site.  *Id.* at 2, ¶ 5.  Nonetheless, there is evidence that Examiner.com staff communicate with Examiners regarding the content of their posts. For example, plaintiffs provide an email exchange between defendant's Director of Content Matt Sandy and one of the Examiner's at issue Sara Gundell.  *See* Docket No.

6

64-1 at 4; *see generally* Docket No. 64-9.  Mr. Sandy and Ms. Gundell discuss the lack

of traffic generated by her posts and engage in a dialogue regarding the importance of

developing contacts with movie studios and getting media credentials for movie

premieres.  *Id.* at 3-4.

      Defendant claims that Examiners can post as frequently or infrequently as they

like, *id.*, whereas plaintiffs assert that the Examiner Agreement obligates Examiners to

regularly create content as "reasonably needed."  Docket No. 21-2 at 2, ¶ 1.  Plaintiffs

also cite to emails from Examiner.com staff to Examiners "who haven't published this

month" encouraging each Examiner to publish before a certain date to "keep your

account active."  *See, e.g*, Docket No. 64-8 at 2; *see also id.* at 8-9.

      Defendant provides Examiners with free access to a library of photos it licenses

from Getty Images, regularly encouraging Examiners to make use of such photos.

Docket No. 19 at 3, ¶ 7.  An online training module that is part of Examiner University

provides examiners with additional instructions regarding copyrighted content.  *Id.* at 3,

¶ 8.  Defendant maintains a list of Examiners who have been subject to complaints for

posting copyrighted material without permission.  Docket No. 19 at 5, ¶ 16.  Under

defendant's policy, after an Examiner receives three complaints regarding instances of

infringement, the Examiner is subject to termination from use of the site.  Docket No. 20

at 4, ¶ 16.  Defendant takes no steps to interfere with third-party copyright protection

measures.  Docket No. 19 at 5, ¶ 17.

      Defendant admits that the Examiner site displayed 75 of plaintiffs' copyrighted

photographs without permission, but argues that the Examiners who included those

images in posted content did so without involvement from Examiner.com staff.  Docket

No. 63 at 4, ¶ 19; *see also* Docket No. 1-2.  On July 9, 2013, defendant received a letter from plaintiffs' counsel identifying certain of plaintiffs' photographs that appeared on Examiner.com and asserting that defendant was in violation of plaintiffs' copyrights. Docket No. 19 at 4, ¶ 11.[2]  On July 24, 2013, defendant notified plaintiffs that all identified photographs had been removed from Examiner.com.  *Id.* at 4, ¶ 12. Defendant received no other communication from plaintiffs until February 25, 2014, when plaintiffs' complaint was served on defendant.  Docket No. 19 at 4-5, ¶ 13.  On March 3, 2014, defendant's general counsel provided written notification to plaintiffs that all photographs identified in the complaint had been removed from Examiner.com on February 27, 2014.  *Id.* at 5, ¶ 14.

On February 24, 2014, plaintiffs filed this case against defendant and the Anschutz Corporation.  Docket No. 1.  On April 7, 2014, plaintiffs voluntarily dismissed the Anschutz Corporation from the case.  Docket No. 11.  Plaintiffs bring claims against defendant for direct copyright infringement, contributory copyright infringement, vicarious copyright infringement, and inducement of copyright infringement.  Docket No. 1 at 4-6.  Plaintiffs also seek injunctive relief and attorneys' fees.  *Id.* at 7.

On May 15, 2014, defendant filed the present motion seeking summary judgment in its favor on all plaintiffs' claims.  Docket No. 19.  Defendant argues that it is entitled to immunity from plaintiffs claims under the "safe harbor" provision of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c).  *Id.* at 1.  In the alternative,

---

[2]At all times relevant, defendant has had a Designated Agent to Receive Notification of Claimed Infringement and has place contact information for its agent on Examiner.com.  Docket No. 19 at 4, ¶ 10.

defendant argues that it is entitled to judgment as a matter of law on plaintiffs' claim for inducement of copyright infringement.  Docket No. 19 at 17.  On June 20, 2014, plaintiffs filed a motion under Fed. R. Civ. P. 56(d) seeking to defer further briefing on defendant's motion pending discovery on the applicability of the safe harbor provision. Docket No. 36.  On August 7, 2014, the assigned magistrate judge granted plaintiffs' motion in part.  Docket No. 46.  On February 17, 2015, plaintiffs filed their response brief to defendant's motion for summary judgment.  Docket No. 63.  On March 9, 2015, defendant filed its response brief.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

9

## III. ANALYSIS

The DMCA was enacted in 1998 with one of its goals being to "update domestic copyright law for the digital age."  *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 26 (2d Cir. 2012).  In so doing, Congress did not alter existing copyright law, but instead created safe harbor provisions to limit liability for "service providers."  *Id.* at 27; *see also UMG Recordings v. Shelter Capial Partners LLC* ("*UMG II*"), 718 F.3d 1006, 1028 (9th Cir. 2013) ("Congress explicitly stated in three different reports that the DMCA was intended to protect qualifying service providers from liability for all monetary relief for direct, vicarious, and contributory infringement.") (emphasis and quotations omitted). "Because the DMCA safe harbors are affirmative defenses, [defendant] has the burden of establishing that [it] meets the statutory requirements."  *Columbia Pictures Indus., Inc. v. Fung* ("*Fung II*"), 710 F.3d 1020, 1039 (9th Cir. 2013).

To qualify for safe harbor protection, a party must satisfy a set of threshold criteria.  *Viacom*, 676 F.3d at 27.  First, the party must be a "service provider" as that term is defined under the DMCA.  17 U.S.C. § 512(k)(1).  Second, in satisfying "conditions of eligibility," the party must adopt and reasonably implement "a policy that provides for the termination in appropriate circumstances of subscribers and account holders . . . who are repeat infringers" and must accommodate "standard technical measures" that copyright owners use to identify or protect copyrighted works.  § 512(i). Here, plaintiffs concede that defendant is a "service provider" and do not dispute that defendant has satisfied the threshold conditions of eligibility.  *See* Docket No. 63 at 7. Once a service provider initially qualifies for protection under the DMCA, it must satisfy

the requirements of a particular safe harbor.  *Viacom*, 676 F.3d 27.

## A.  Applicability of § 512(c)

The parties dispute whether defendant is entitled to protection pursuant to the

§ 512(c) safe harbor provision.

> A service provider shall not be liable for monetary relief, or, except as
> provided in subsection (j), for injunctive or other equitable relief, for
> infringement of copyright by reason of the storage at the direction of a user
> of material that resides on a system or network controlled or operated by or
> for the service provider, if the service provider--
>
> **(A)(i)** does not have actual knowledge that the material or an activity using
> the material on the system or network is infringing;
>
> **(ii)** in the absence of such actual knowledge, is not aware of facts or
> circumstances from which infringing activity is apparent; or
>
> **(iii)** upon obtaining such knowledge or awareness, acts expeditiously to
> remove, or disable access to, the material;
>
> **(B)** does not receive a financial benefit directly attributable to the infringing
> activity, in a case in which the service provider has the right and ability to
> control such activity; and
>
> **(C)** upon notification of claimed infringement as described in paragraph (3),
> responds expeditiously to remove, or disable access to, the material that is
> claimed to be infringing or to be the subject of infringing activity.

§ 512(c)(1).[3]

### 1.  *"at the direction of a user"*

Section 512(c) applies to infringements that occur "by reason of the storage at

the direction of a user of material" on a service provider's system or network.

---

[3]Section 512(c)(2) also requires that the service provider have a designated
agent to receive notifications of claimed infringements.  Plaintiffs do not dispute that
defendant has properly registered such an agent for receipt of DMCA notices.  *See*
Docket No. 63 at 7.

§ 512(c)(1).  Thus, before reaching the three prongs of the § 512(c) safe harbor

defense, *see* § 512(c)(1)(A)-(C), the initial applicability of § 512(c) turns on whether the

claimed infringements occurred in the manner contemplated by § 512(c)(1).  Plaintiffs

dispute only whether the Examiners at issue are "user[s]" under § 512(c).  Docket No.

63 at 11-12.  Plaintiffs argue that the term "user" should not be given its plain and

ordinary meaning, but should instead be defined so as to exclude from the "user" a

service provider's "owner[s], employee[s] and/or agent[s]."  *Id.* at 9.  Defendant, on the

other hand, argues that the term "user" is not a term of art and refers to any person who

uses an "internet-based platform."  Docket No. 65 at 5.  Defendant contends that the

proper inquiry for determining the threshold applicability of § 512(c) is "[w]as the

allegedly infringing content at issue posted '***at the direction of*** *a user*' or was it 'at the

direction of' [defendant]?"  *Id.* (citation and quotations omitted, emphasis in original).

Defendant takes the position that this question is best answered by reference to

traditional principles of agency law.  *Id.*

   The Court first turns to the meaning of the term "user."  Section § 512(c) does

not define "user" and it appears, as the parties' briefs suggest, that no court has

squarely construed the term.  In interpreting a statute, the Court begins with the plain

language of the statute, interpreting it "in light of the purposes Congress sought to

serve" and considering a particular provision's place in the overall statutory scheme.

*Wright v. Fed. Bureau of Prisons*, 451 F.3d 1231, 1234 (10th Cir. 2006) (quotations

omitted).  "If the statutory language is clear, our analysis ends and we must apply its

plain meaning."  *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1161 (10th Cir.

2011).  If the court determines that the statute is ambiguous, "the court then looks beyond the plain text to resolve the ambiguity, examining legislative intent [and] overall statutory construction." *Id.* (quotations omitted).

Here, the words of § 512(c) do not compel the conclusion that "user" should be defined narrowly or with reference to traditional principles of agency.  The dictionary definition of "user" is "one that uses," and the definition of "use" is "to put into action or service: to avail oneself of" or "to carry out with a purpose or action by means of." *Merriam-Webster's Collegiate Dictionary* 1297 (10th ed. 2001).  If these definitions are applied to § 512(c)(1), then "user" describes a person or entity who avails itself of the service provider's system or network to store material.  This description is consistent with the generally understood meaning of the term in the DMCA context.  *See Viacom*, 676 F.3d at 39 (referring to "users" both as persons who upload content to YouTube and persons who access YouTube to view uploaded content); *UMG II*, 718 F.3d at 1018 (same).

Plaintiffs argue that the term "user" cannot be interpreted in this way because "[o]wners, employees and agents are typically users of their business' website" and "courts have already found that owners, employees, agents (and even implied agents) are not 'users' within the meaning of the DMCA safe harbor provisions."  Docket No. 63 at 8-9.  Therefore, plaintiffs claim that "case law dictates that the word 'user' is a legal term of art for purposes of applying the safe harbor provisions of the DMCA." *Id.* at 9. There are several problems with this argument.  First, plaintiffs assume that the word "user" cannot be given its plain meaning because there is a need to distinguish between

storage at the direction of the service provider and storage at the direction of third parties and that such distinction should be made through the interpretation of "user." However, as other provisions of § 512 demonstrate, Congress knew how to make such a distinction without mentioning "user."  Both §§ 512(a)(1) and 512(b)(1)(A) utilize the phrase "a person other than the service provider" to differentiate between the service provider and other persons.  More specifically, § 512(a)(1) uses the phrase "at the direction of a person other than the service provider," which is analogous to the distinction that plaintiffs urge be made through the definition of "user" in § 512(c)(1). The fact that Congress elsewhere in the statute made the distinction between service providers and third parties with different words cautions against plaintiff's interpretation.

Second, the perceived need to distinguish between service providers and third parties in the language of  § 512(c)(1) does not exist.  The service provider behavior that plaintiffs are concerned about is already addressed in subparagraphs (A) through (C) of § 512(c)(1).  For example, the term "storage" limits a service provider from invoking safe harbor protection for its own conduct because, although "storage" encompasses "automated process[es] for making files accessible," *UMG II*, 718 F.3d at 1020, service providers lose protection for activities they undertake that lack a causal connection to user-initiated storage of infringing material.  *See, e.g.*, *Viacom*, 676 F.3d at 40 (remanding for further fact finding where YouTube manually selected "copyrighted material for licensing to a third party"); *Gardner v. CafePress Inc.*, 2014 WL 794216, at *1 (S.D. Cal. Feb. 26, 2014) (ruling that service provider who had exclusive control of marketplace where uploaded infringing images were sold and ability to modify such images was not entitled to safe harbor protection as a matter of law).  Moreover,

14

§ 512(c)(1)(B) excludes from safe harbor protection infringing activity that confers a financial benefit upon the service provider if the service provider "exert[s] substantial influence on the activities of users," such as "high levels of control over activities of users" or "purposeful conduct." *UMG II*, 718 F.3d at 1030. Thus, to define the term "user" narrowly or to read agency principles into the term would, in many instances, be unnecessary and redundant given the effect of § 512(c)'s other provisions. *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 877 (1991) (noting that court should avoid interpreting a statutory provision "so as to render superfluous other provisions in the same enactment").

The cases upon which the parties rely do not compel a different interpretation of the term "user." Both parties cite to *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 517-18 (S.D.N.Y. 2013), in support of their respective arguments. In *Vimeo*, the court considered whether § 512(c) applied to protect the video sharing site Vimeo from copyright infringement liability for videos uploaded by Vimeo employees. *Id.* at 518. Plaintiff argued that such videos were not "stor[ed] at the direction of a user." *Id.* Although the court did not identify an ambiguity in § 512(c)(1), it relied on legislative history that stated "'[i]nformation that resides on the system or network operated by or for the service provider through its own acts or decisions and not at the direction of a user does not fall within the liability limitation of subsection (c).'" *Id.* at 517 (quoting S.Rep. No. 105-190, at *43 (1998)).[4] In determining if "employee-uploaded videos may

_____

[4]This legislative history does not indicate that the term "user" was intended to mean what plaintiffs suggest. Moreover, the legislative history does not indicate that the issue of whether information resides on a system through the acts or decisions of a service provider must be addressed, as the parties appear to argue, by a dispositive,

be deemed to have been stored 'at the direction of a user,'" the Court concluded that the relevant inquiry was whether, "under traditional principles of agency law, Vimeo's employees stored their videos as independent 'users' or rather on behalf of the company as Vimeo staff." *Id.* at 518 (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1161-62 (2d Cir. 1971) (discussing vicarious and contributory copyright infringement)).  However, the court did not, as plaintiffs suggest, define the term "user" or otherwise explain why traditional agency principles were the appropriate measure by which to determine whether Vimeo was entitled to § 512(c) protection as opposed to, for example, charging Vimeo with knowledge of its employees' uploads under § 512(c)(1)(A).  Moreover, unlike *Vimeo*, plaintiffs here do not claim that the Examiners at issue were defendant's employees.  As a result, *Vimeo* is not directly applicable to the present dispute.

Plaintiffs cite to *Columbia Pictures Indus., Inc. v. Fung* ("*Fung I*"), 2009 WL 6355911, at *13 (C.D. Cal. Dec. 21, 2009), *affirmed in part as modified by Fung II*, 701 F.3d at 1020, where the court considered whether the operator of multiple bit torrent websites was liable for inducement of infringement due, in part, to statements made by moderators on defendants' websites.  However, *Fung I* did not interpret the term "user" or the initial requirements of § 512(c) and is therefore inapplicable.

Defendant cites *Capitol Records, Inv. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 635 (S.D.N.Y. 2011), *modified on reconsideration on other grounds by* 2013 WL 1987225 (S.D.N.Y. May 14, 2013), where defendant's executives used their personal

initial inquiry as to the meaning of "user."  To so conclude would contravene or render superfluous other provisions of § 512(c).

16

accounts to download copyrighted songs onto defendant's servers.  The court did not consider whether defendant's executives were "users," but rather whether the executives' activity was sufficient to satisfy § 512(c)(1)(A)'s actual or "red flag"[5] knowledge requirement.  *Id.* at 644.  The court concluded that, because plaintiff failed to show that defendant's executives downloaded songs "from clearly pirate websites," such activity was, by itself, insufficient to confer the requisite knowledge on defendant. *Id.*  *MP3tunes* is therefore unhelpful in resolving whether defendant has satisfied the initial requirements of § 512(c)(1).

For the foregoing reasons, the Court rejects plaintiffs' proposed definition of the term "user" and instead adopts the plain meaning definition the Court identified earlier. Plaintiffs do not raise any other arguments regarding the initial requirements of § 512(c)(1).  As a result, the Court finds that the Examiners are "users" within the meaning of the statute.  However, as discussed above, safe harbor protection does not extend to all user uploaded content, but only to content uploaded "*at the direction of* a user."  § 512(c)(1) (emphasis added).  The question becomes whether plaintiffs' photographs were stored on defendant's system at the direction of the Examiners at issue or whether plaintiffs' photographs were stored on defendant's system at the direction of defendant.  On this question, plaintiffs provide no evidence creating a genuine dispute of material fact.

Defendant asserts each Examiner alone determines the content of his or her

---

[5]So called "red flag" knowledge refers to an awareness of the "facts or circumstances from which infringing activity is apparent."  *See UMG II*, 718 F.3d at 1023.

articles, including whether or not they are illustrated by photographs.  Docket No. 19 at

3, ¶ 5.  Plaintiffs attempt to create a genuine dispute of material fact by citing to emails

from defendant to Examiners where defendant solicits articles on specific topics.  *See*

*generally* Docket No. 64-10.  For example, defendant emailed Examiners to announce

a new "Examiner Celebrity" page.  *Id.* at 17.  Defendant states that it is looking for

content concerning celebrities' physiques, fashion trends, or news and that "[s]lide

shows are a must for this area."  *Id.*  However, there is no indication that defendant

directed the Examiners to upload plaintiffs' photographs or any other infringing content.

The record contains no evidence of any communications between defendant and the

Examiners at issue regarding plaintiffs' photographs or the posts in which plaintiffs'

photographs appeared.  Defendant asserts that it did not pre-screen, edit, or approve

any of the content at issue before it was posted to Examiner.com.  Docket No. 19 at 3,

¶ 6.  Although a dispute of fact may exist as to whether defendant had content

managers or a review team, Docket No. 64-3 at 2; Docket No. 65-1 at 1-2, ¶ 5, there is

no evidence suggesting that a content manager, review team, or any Examiner.com

staff had any actual control or influence over the content of the articles containing

plaintiffs' photographs so as to render the use of plaintiffs' photographs at the direction

of defendant.

Moreover, defendant explicitly directs Examiners not to post infringing content,

stating in the Examiner agreement that Examiners "must have permission from the

owner/copyright holder of any content before including it on your Web Page, unless it

was provided by Examiner.com."  Docket No. 21-2 at 3, ¶ 4.a.  The Editorial

Requirements contain a similar prohibition on unlicensed content.  *See* Docket No. 21-3

at 3, ¶ 6 ("[d]o not include any copyrighted material on our site (including text, photos, video, audio, or anything else) without the permission of the owner").  Defendant notifies Examiners of its repeat infringer policy and has barred repeat copyright infringers from posting material on Examiner.com.  *See* Docket No. 20 at 4-5, ¶¶16-19.  Defendant also provides Examiners with free access to a library of licensed photos, regularly encouraging examiners to make use of such photos.  Docket No. 19 at 3, ¶ 7.  These agreements and policies may not, by themselves, be sufficient to render the upload of infringing material "at the direction of a user."  However, in the absence of evidence that defendant directed the Examiners at issue to upload plaintiffs' photographs to the site, defendant's policies further support the conclusion that plaintiffs' photographs did not come to reside on Examiner.com at the direction of defendant.  Defendant has presented sufficient evidence upon which to satisfy the initial requirements of § 512(c)(1), and plaintiffs have failed to provide evidence or argument that creates a genuine dispute of material fact.

### 2. Knowledge

Defendant asserts that it has satisfied § 512(c)(1)(A) because, upon receiving information from plaintiffs' counsel notifying defendant that plaintiffs' photographs were posted on Examiner.com, it promptly removed plaintiffs' photographs from the site.  Docket No. 19 at 4-5, ¶¶ 11-14 (citing Docket No. 20).  Plaintiffs argue that defendant had actual knowledge pursuant to § 512(c)(1)(A)(i) or "red flag" knowledge pursuant to § 512(c)(1)(A)(ii) because it was "willfully blind" to infringements occurring on Examiner.com.  Docket No. 63 at 16-17.

The safe harbor provision of § 512(c) does not place upon the service provider

19

the burden of determining whether materials on its system or network are actually illegal. *Viacom*, 676 F.3d at 32.  "[M]erely hosting a category of copyrightable content . . . with the general knowledge that one's services could be used to share infringing material, is insufficient to meet the actual knowledge requirement under § 512(c)(1)(A)(i)."  *UMG II*, 718 F.3d at 1022.  Rather, § 512(c) requires knowledge or awareness "of [the] specific infringing activity."  *Viacom*, 676 F.3d at 30.  Thus, "the actual knowledge provision turns on whether the provider actually or 'subjectively' knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person."  *Id.* at 31.  The willful blindness doctrine may be applied in the context of § 512(c)(1)(A), but only to the extent the evidence establishes that a service provider "willfully bur[ied] its head in the sand to avoid obtaining . . . knowledge" of the specific infringing activity.  *UMG II*, 718 F.3d at 1023.

The only evidence plaintiffs provide of defendant's willful blindness to the Examiners' use of plaintiffs' photographs is the series of emails from defendant to various examiners requesting photos and videos regarding "the Oscars, new TV lineups and premiers, new movies, celebrity scandals, celebrity bodies, celebrity styles, celebrity news and Emmy Awards fashions."  Docket No. 63 at 17-18 (citing Docket No. 64-10).  However, plaintiffs do not provide any evidence that, by posting photos or videos on such topics, Examiners would necessarily use plaintiffs' copyrighted photographs.  The emails upon which plaintiffs rely, at best, suggest that defendant may have had a general awareness that Examiners could post infringing content in response to such requests, but general awareness is insufficient to create a genuine

20

dispute as to whether defendant had knowledge of or was willfully blind to the specific infringements alleged in this case.  *See UMG II*, 718 F.3d at 1023.  Plaintiffs otherwise fail to provide evidence specific to any of the claimed infringements upon which a reasonable juror could conclude that defendant possessed the requisite actual or red flag knowledge.

As to § 512(c)(1)(A)(iii), plaintiffs do not dispute that, upon receiving information from plaintiffs' counsel regarding the claimed infringements, defendant acted expeditiously to remove plaintiffs' photographs from Examiner.com.  Defendant has provided sufficient evidence upon which to conclude that it satisfied the requirements of § 512(c)(1)(A).  Plaintiffs have failed to provide evidence creating a genuine dispute of material facts.  As a result, defendant is entitled to summary judgment as to § 512(c)(1)(A).

### 3.  *"financial benefit directly attributable to the infringing activity"*

In order to receive safe harbor protection, the service provider must establish that it "does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." § 512(c)(1)(B).  As to the issue of financial benefit, Ms. Austin states that defendant derives revenue from display advertising placed on Examiner.com, but, although "those revenues are determined, in part, by the volume of visitors to Examiner.com, no advertising revenues are associated with or dependent upon any particular web page posted by an Examiner, much less any particular photograph posted by any examiner." Docket No. 21 at 4, ¶ 14.  Plaintiff argues that the fact that defendant receives revenue from display advertising and the fact that Examiners are contractually obligated to drive

21

traffic to the site creates "a symbiotic relationship between AXS and its Examiners, whereby both derive a financial benefit from the Examiners' efforts to drive traffic to the Website and share in the resulting revenue derived by such traffic."  Docket No. 63 at 19.  Plaintiffs provide no additional evidence in support of their argument.

The Ninth Circuit has suggested that, where a service provider charges users for its services, a directly attributable financial benefit exists "where there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is in proportion to a defendant's overall profits."  *Fung II*, 710 F.3d at 1044 (quotations omitted, emphasis in original).  Where, as here, the service provider derives its revenue from advertising, the inquiry focuses on whether "the connection between the infringing activity and [the service provider's] income stream derived from advertising is sufficiently direct."  *Id.* at 1045.  In *Fung II*, the court found a sufficient connection based upon a confluence of circumstances: "Fung promoted advertising by pointing to infringing activity; obtained advertising revenue that depended on the number of visitors to his sites; attracted primarily visitors who were seeking to engage in infringing activity, as that is mostly what occurred on his sites; and encouraged that infringing activity."  *Id.*; *see also Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007) (holding that, where a service provider derives revenue from subscribers, the relevant inquiry is "whether the infringing activity constitutes a draw for subscribers, not just an added benefit" (quotations omitted)); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 748 (S.D.N.Y. 2012) (finding no direct financial benefit where no evidence indicated that defendants

22

"capitalize[] specifically because a given image a user selects to print is infringing").

Here, there is no evidence that defendant marketed to advertisers by pointing to infringing content, that users considered Examiner.com a reliable source of infringing content, that any users visited Examiner.com because it hosted infringing content, or that defendant actively promoted infringing content as a way of attracting more page views. *Cf. Fung II*, 710 F.3d at 1045. To the contrary, the record reflects that defendant promptly removes infringing content of which it has become aware and has policies directed at curtailing infringing activity. As a result, there are no facts supporting an inference that defendant's revenue stream is in any way predicated on or derived from the availability of infringing material on Examiner.com. Because plaintiffs have failed to provide evidence upon which to conclude that defendant derives direct financial benefit from infringing activity, the Court need not reach the question of whether defendant had a right and ability to control infringing activity.[6] Defendant is therefore entitled to summary judgment as to § 512(c)(1)(B).

Plaintiffs do not dispute any remaining aspects of § 512(c). As a result, the Court concludes that defendant is entitled to § 512(c) safe harbor protection. Defendant's motion for summary judgment is granted and plaintiffs' claims for direct copyright infringement, contributory copyright infringement, vicarious copyright infringement, and inducement of copyright infringement are dismissed. *See UMG II*, 718 F.3d at 1013, 1031 (upholding grant of summary judgment in service provider's

---

[6]Although the "right and ability to control" inquiry is often treated as a threshold issue, *see, e.g.*, *UMG II*, 718 F.3d at 1026, the Court need not reach that inquiry in order to resolve the present motion.

favor on claims for direct, vicarious, contributory, and inducement of copyright infringement).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant's Motion for Summary Judgment [Docket No. 19] is **GRANTED**.  It is further

**ORDERED** that plaintiffs' claims are dismissed and this case is dismissed in its entirety.

DATED March 31, 2015.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge